May it please the Court, Anna Kalluri on behalf of the United States. This Court shall reverse the District Court's order granting the motion to suppress evidence and remand for further proceedings. Here the District Court erred when it sui sponte found that the police operated a checkpoint for general crime control in violation of Edmund, which resulted in unconstitutional seizure of the bus. The driver did not park the bus at the bus stop as a result of police action, but simply as a matter of greyhound schedule. Accordingly, the bus was not seized under the 4th Amendment. In addition, the District Court What about the argument that they know that greyhound's policy is to stop at this particular rest stop or whatever it was and therefore they're kind of laying in wait and that's the equivalent of a checkpoint? It's true that there's a schedule that greyhound adheres to and the schedule did dictate that the bus would stop at that stop at that scheduled time and the police officers were there. However, this is not a checkpoint. It is not a seizure. The choice of individual or corporate action to stop the bus there does not result in government seizure of a bus simply because the officers were there and they requested entry onto the bus. Virtually the same situation was approved of in Drayton. In Drayton, the same thing happened. There was a scheduled bus stop. The bus pulled in. All of the passengers disengaged from the bus. They got off the bus. They did whatever they were doing at the stop. And then as they were going back onto the bus, the bus driver collected all of their bus tickets. They all stayed on the bus. The bus driver then went to deal with some administrative matters, keeping hold of the tickets. And when he was leaving the bus, that's when the officers asked him if they could board the bus and look around. The driver gave consent. There was no seizure of the bus. The Supreme Court approved that scenario in 2002 in Drayton. Here we have essentially the same facts. But I would say it's even less coercive, if you will. This stop here, the passengers were able to get on and off the bus. They still retained their tickets. There wasn't anything that kept them on the bus. There wasn't anything that kept them off the bus. They were free to move about the bus and or the bus stop, which is presumably a gas station. I don't know if the record shows this, but was this specific bus, or they were there just asking every bus driver that made a stop there at the stop to question or look inside the bus? Was it something that they were there for several hours just doing it for every bus? Or did they, for some reason, pick out just this bus? There is no evidence in the record regarding this. This was not an issue raised by the defendant below. The defendant only challenged. He said he was seized at the moment that the police officer asked him to step off the bus. So anything prior to that fact wasn't challenged by the defendant below. So the facts. The district court made findings on that. He did. The district court's response did. So we know that the police officers have done this previously, because the officers testified that they keep the aisles clear. They've had other passengers who have declined to speak with them. They let them go about their business, people enter the bus, people exit the bus. So the officers have done this before, but there's no record – there's no evidence in the record about what specifically occurred this day. If it was every bus, if it was just this bus, how long they were there, those details were not developed. Does it matter that the officers didn't tell Mr. Wise that he could refuse to cooperate? No. And, in fact, the Supreme Court has clearly said that they don't have to tell the office – the passengers that they could cease the conversation as long as it is clear to a reasonable person. And here I would suggest that it was clear to a reasonable person. They didn't confiscate their tickets. They kept the aisles clear. They spoke in conversational voices. They moved about the bus. The bus was open. They could get on. They could get off. And so here I think a reasonable person would agree that they were not required to speak with the officers. Is there any evidence that anyone got off or refused to speak to him at the stop? All we know is Mr. Wise, but do we know about the reaction to other people? Did people walk off while the policemen were interviewing people or walking around or did anybody refuse to talk to them? There's no – the district court did question the officers about this. They said it's typical for people to get on and off. The bus was still stopped there. They assumed people got on and off, but neither of the officers saw if people did. They got on the bus. One went to the back. One was in the front. They were talking to the passengers on the bus. They didn't have any knowledge of people getting on or off the bus. But we do know that when it pulled in, the driver did exit the bus and the doors were open, so it's likely that people did. This was the bus stop. This is where they were able to use the restroom, smoke a cigarette, go get food, what have you. Presumably, people did. So the district court's finding that this was a checkpoint was clearly erroneous. I'm sorry, was just – was in error. This was not a checkpoint. The district court found that this was a checkpoint because it was the forced interaction between the police officers and the bus driver and the passengers, but here there was no forced interaction. The Fourth Amendment comes into play only when there's a seizure, and here there was no seizure. Greyhound decided that this was the bus stop. The bus driver pulled the bus into the stop, stopped the vehicle, exited the vehicle, and that's when the police officers approached. He gave consent for the officers to board the bus, and at that point, they engaged with a consensual encounter with the passengers on the bus. This was not a checkpoint. And it's up to the bus driver to determine consent, and the passengers have no right of any expectation of not being detained? Is it totally up to the bus driver as the one in charge of the bus? What rights do the individuals in the bus have? Well, the bus passengers have the rights of any other passenger in a vehicle. When you look at private vehicles, the driver or the owner, they can give consent to the search of a vehicle that is within their right. The passenger's rights come into play if the passenger, for example, has an ownership interest in the vehicle, or later if there is a search of something that the passenger has an expectation of privacy in. For example, if it's their luggage in the back or something like that, that confers a Fourth Amendment right to them to challenge the search or the seizure. Here, a person on a bus, yes, it is the bus driver who can give consent to board the bus or not. But that's within context of once the officers are on the bus, the passengers have the right to stop the interaction and not engage with the police officers. And that's where the question is. What about this notion of forced consent of the bus driver that the judge found that, well, if Greyhound wants to keep doing business in Conroe or whatever, they've darn well better give consent or they're going to get every police officer in the state jumping all over him? How do you respond to that? There's no evidence of any of that in the record. The district court relied on a district court case from 2002 in Pennsylvania. And there, Greyhound said that its policy in that area, in that time, in that state, in that year, was that the bus drivers should consent, if they could, to the officers boarding the bus. But if they were not on schedule, there were some other reasons they could decline to do that. So I think that that policy there indicates that there was a general willingness to cooperate with officers if they wanted to board the bus. However, the driver still has the discretion to say no. And that was fully part of the policy that Greyhound has. Now, I need to say, even under that policy, if it applies, I think that's still here. There is no forced coercion here. The driver could have said no. That would have been well within the policy. Presumably, he's aware of the policy that Greyhound has. Again, though, that case that the district court relied on was from 2002 in Pennsylvania. There's no bearing on how that applies to— What if Greyhound had an just unrelenting policy, no discretion on the bus driver, just said, if you're working for us, you're in one of our buses, give consent to the police officers, period? Would that change the outcome? No, it wouldn't. Because the defendant doesn't have a — doesn't have standing to challenge the consent. The defendant only has standing if he has an ownership interest or a privacy interest in the thing being seized, here the bus, or the thing being searched, which would be the backpack that had the cocaine. He has no interest in the bus. He has no standing to challenge the consent. So Greyhound is the consentor. And so if Greyhound decides, as a matter of company policy, that they're going to cooperate with law enforcement, then they can do that, right, as a blanket consent. It's not really — doesn't really matter what the driver thinks, does it? Because the driver doesn't own the bus, I presume. Well, I would agree with you, Your Honor. And I think that's why below, the defendant didn't challenge the consent of the driver. This wasn't an issue raised in the district court. What he challenged was the — what he alleged to be a seizure when the officer asked Mr. Wise to depart from the bus. That's the point where he says a seizure occurred. He doesn't challenge the stop. He doesn't challenge the driver's consent. And, again, going back to that, I don't believe he has standing to challenge the consent. Even if he did, there's nothing here to show that it was anything but voluntary. All right. So narrow in on what he originally challenged and tell me what's wrong with his argument on getting him off the bus at the moment that he was taken off. So he initially challenged — he said that he was seized at the moment that the officer asked him to exit the bus. He says that the officer, by motioning in some sort — the record is somewhat unclear as to the motion that he made, but presumably it's a waive — and his request that Mr. Wise exit the bus, he says that he was seized at that point and that there was no reasonable suspicion. That is incorrect. At the point that the officer went back to the bus and asked him to step off the bus, first, it was a consensual encounter. It was a request. The district court found that his consent was not voluntary. But again, it was based on this policy from Greyhound in Pennsylvania in this 2002 case. He said it can't be voluntary because there was a checkpoint, and if there's a checkpoint, then he was unconstitutionally seized and there wasn't enough dissipating time between the seizure and the consent for that to actually truly be voluntary. And then also he relied on the Greyhound policy. So the district court assumed that his consent was voluntary, but that it was not freely given, given the checkpoint, given the Greyhound policy. And within that context, he said it was not. However, here, I think that the interaction was consensual. The officer didn't raise his voice. He made a request. We would have to find that as a matter of law, given that the district court's fact findings were to the contrary. So, well, I don't think so. I think that there's — the facts about the consent are in — are not disputed. He doesn't — he — the district court looks at the law of checkpoint and law of the Greyhound policy as a matter that's saying, even though this consent was voluntary, it was coerced because of these reasons. I think that's a legal issue that this court could find. But I don't think the court has to find that, because at this point, we do have reasonable suspicion. And so reasonable suspicion is a matter of law that this court can find. And here, I think between the feigning sleep, the generic name, the fact that the — the backpack and the duffel bag were nestled together, the backpack was abandoned, they later found cocaine in it after a drug sniff, all of that is reasonable suspicion. There was no other luggage around these two pieces of bags. It was directly above Mr. Wise. I think all of that is enough to have reasonable suspicion to — Sotomayor, you voluntarily emptied his pockets, right? Yes, he did. So after he gets off the bus, they ask him if he has any weapons. And he says no. And they ask him to voluntarily — to empty his pockets. And he does that. Again, all of this is still within the context of a voluntary encounter. Everything that he does, he voluntarily does it. Alternatively — How quickly did they open the backpack in this, remind me? So the — after they ask everyone on the bus if it was anyone's — Mr. Wise had disclaimed ownership of it, the people around him had disclaimed ownership, everyone on the bus had disclaimed ownership, they pick up the backpack and they walk outside and they talk to the driver. The driver says he doesn't recall whose it is. And they ask, well, no one's claiming it. What would you like us to do with it? And he says, get it off my bus. So they take it off the bus. They put it on the ground. They pull out a few other luggage pieces, and they have the K-9 go around and sniff. The K-9 alerts to the backpack. And that's before they ask him to get off the bus? That's before they ask him to get off the bus. And according to the reasonable suspicion point? Oh, absolutely. I'm sorry, Your Honor. I mentioned that, but didn't — I'm sorry. I misremembered the fact. My apologies. I thought I did mention that. Yes. So they already have the K-9 sniff. They open it up, and there's the white powdery substance later confirmed to be cocaine in there. So it's at this point that they go back in and they request that he gets off the bus. Again, he consents to it. He gets off the bus. At that point, they ask him if he has weapons. He says no. They ask him to empty his pockets, and he does, and that's when they find his ID, which gives his true name, which doesn't match to his ticket. And then they also find a key there that matches the lock to the backpack, which they had used bolt cutters to remove. So at this point, the stop took about 25 minutes from the point where they asked consent to board the bus until when Mr. Weiss is arrested. It was all proper. It was a consensual encounter that developed into reasonable suspicion, then later probable cause. Thank you. Let me ask you another question. It seems like there was a considerable amount of time between the hearing and the final findings by the court. Yes. Is there some reason for it that you might be aware of? I don't know the reason for it. So the stop occurred at the end of 2011. The motion to see there was after this incident occurred, there was further investigation. And so the defendant was actually, I believe, indicted at the beginning of 2012. The motion to suppress was litigated in 2013, and shortly after the hearing, the judge indicated that he was going to grant the motion to suppress, and the parties responded saying, you know, we'll consider whether to appeal when we get the written decision. The defendant filed a motion to dismiss, as is appropriate with a motion to suppress that is granted. And the district court said, well, I've got to write it up. Essentially, you had to write the initial opinion. Over three years later, he wrote the opinion, and this appeal followed. Because he was out on bond. He was out on bond, so. Thank you. Some of us write slower than others, I guess. Perhaps. Thank you. May it please the Court. John Kinchin for Morris Alexander Wise. Your Honors, there are several bases upon which this Court can affirm the district court's suppression order, and I want to begin with the first one that was discussed by government counsel, and that is that this incident at the bus station was a checkpoint. Following up on Judge Haynes's initial question, this was not a situation where the Conroe police just happens upon a parked bus, casually talks to the driver and gets consent to board to question the passengers. This was an orchestrated program. To go to Judge Prado's question about whether or not all buses were stopped, that's exactly what the district court found based upon the evidence, the testimony, and the testimony also at the bond hearing. These were planned weeks in advance, and they occurred every two weeks. Is there a key difference between this and a checkpoint that the stoppage is not caused by the officer? It's not. In fact, the Supreme Court waded head on into this distinction as to whether or not a checkpoint requires a stop in the case of U.S. v. Martinez-Fuertes, where the government, much like in this situation, said, not a checkpoint. The bus never actually, the automobiles never actually stopped. The defendant said, yeah, there is a stop here. It is a checkpoint. And what the Supreme Court ultimately said is that it doesn't matter. We're going to consider that it's a virtual stop. But the point is, this is not something where a bunch of officers are standing there and you kind of slow down to get past them and all of that, and then maybe they wave you in or something like that. This is something where the stop itself, whether a stop, a slowdown, or anything else, is entirely voluntary on the part of Greyhound, and Greyhound decided, we don't like this truck stop anymore. We're going to go one exit down. Officers have nothing to do with that. So there's no slowdown or stop caused by the officers. The officers are simply taking advantage of the fact that there's already been a stop. Doesn't that make a difference? What is the primary factor in all these checkpoint cases is the intrusion on the motorist. And there are levels of intrusion, and that's where the government's argument properly should be, is that, hey, the level of intrusion here on this motorist is low. Let's compare it to the programmatic purpose of the checkpoint. But that's not what the argument is saying, the government is saying. They're saying that there's some bright-line rule by the Supreme Court that there has to be an actual stop. The Supreme Court has not created a constitutional loophole here. What the Supreme Court has looked at time and time again is the government intrusion. And in this case, you certainly had the government intrusion, and I would say that, in many respects, the government intrusion is greater in this situation than some of the other checkpoints, such as Martinez-Fuertes, such as Edmund. Because in those cases, and I'll talk about Edmund, the court has said, you know what, we're also looking at the subjective intrusion, and we're looking at the effect, the anxiety, the concern that would be caused upon the unoffending motorist. And you've got leading up to the stop, you've got signs saying, you are coming up to a checkpoint, we are going to be looking for drugs, or something to that effect. And the Supreme Court has determined that that reduces the anxiety level. Well, you didn't even have that in this situation. You had stoppage, per the district court's finding, you had the Conroe police stopping the bus driver on every single bus every two weeks. But the bus drivers already stopped. I mean, to me, you are conflating the notion of whether it's a stop-slowdown, and that's not, that's kind of a technicality, versus a voluntary decision, I decide to go to rest stop A every day at 10 o'clock on my drive from Houston to Dallas, or whatever, and the police officer knows that and decides to take advantage of that. That's just different. You don't have a case that suggests otherwise. Your Honor, every single Supreme Court case cuts through and talks about the government intrusion upon the unoffending motorist, and you certainly have that. Here, the government is causing the stoppage or the slowdown. You've been making a distinction about, well, I didn't really stop because I was going five miles an hour. And I agree, that's not the distinction. But here, the government isn't causing the stop at all, has nothing to do with the stop, has nothing to do with Greyhound's policy, or anything like that. How can that be a governmental intrusion, if Greyhound's going to stop every day at the Conroe rest stop for 15 minutes, how is that a governmental intrusion for the police officer to show up and talk to the bus driver? Because at some point, right, and Your Honor correctly points out that per schedule, this bus stops, like every bus on that schedule stops at this point on South Frasier, the only place there in Conroe. And the fact is, at that point, you've got five officers that are confronting that bus, one of them uniformed. You've got a K-9 unit. You've got a parked car, all right? Now, you can get into, well, at that point, if it's seized, how much of an intrusion is that? You didn't actually cause the stop, but there you are. Are you delaying it? You can get in all of these types of issues that the Supreme Court says is perfectly appropriate when you are determining whether or not the intrusion is minimal. Because if this Court does determine that the intrusion is minimal, that's one part of the test. Then you get to the programmatic purpose. Because it is a program. At the end of the day, that's what this is. It is a program to check buses. Edmund was a program to check buses. Martinez-Fuerte was a program to check buses. Martinez-Fuerte, they said the intrusion is minimal. The purpose outweighs finding illegal aliens, outweighs the intrusion. And the Court talked about how practically this is better and certainly more constitutional than a roving stop because of the impracticality of looking at cars along the freeway and trying to figure out... Is there evidence of how long this stop would last without the officers being there? There is no evidence. And certainly, our position is that the facts have been fully developed, but if there is anything that this Court feels where the record should be further developed, then certainly, you know, remanding to develop that. If we disagree with you that this was a checkpoint, do you lose? No. There are several bases out there. In addition, now, I think our pleadings are very clear that our position is this is the primary basis of the appeal because of the Supreme Court law on government intrusion. And as Your Honors pointed out, there is a policy of Greyhound that requires these buses to... And the government, the law enforcement knew about this. And the government says, well, that's a 2002 case. But hey, that's what's in the record. And that's all we have in the record. And the Court took that and the testimony of the agents and said... But I have a policy that I say as a judge, I'm just going to always cooperate with police officers. Does that mean that any time I cooperate with them, that's forced? It does not. In this situation, when you're talking about and looking at the level of government intrusion, it does. And also, in the later basis that we point out, Your Honor was asking if there are other with respect to the issue of the driver's consent. That's certainly an issue. That's below. You didn't raise that below. In the district court, the driver's consent. No. The district court raised that. Fortunately, there's no rule or law that the district court can't be smarter than I am. And this district court was on several issues. And we certainly appreciate that. And these are valid points. But I personally didn't raise that issue. But it has been fully briefed. And the fact is that the court did find, based partly on that policy, but also based upon consideration of all the evidence, that factually, the driver's consent was coerced. But I don't understand, really, if the Greyhound is the owner of the bus, and Greyhound has made a determination that, with maybe an exception of emergency, I don't know what, that drivers should consent, driver being their employee, that they're paying to drive this bus and do what they tell them to do. Why does that make that any less consensual? Well, the driver, Greyhound does have a policy. The driver certainly has constitutional rights, separate and apart from. Okay, but you can't assert his constitutional rights or hers. I don't know. Well, the driver did. The driver was. I'm sorry. I talked over Your Honor. The driver did consent that the entire bus could, all the passengers could be questioned and the entire bus could be searched. That obviously applies to Mr. Wise and his belongings. So, you know, our business is to search Mr. Wise's belongings. He did not give consent to search Mr. Wise's belongings, but he did give consent to essentially board the bus and look at the overhead bins where the. Well, Greyhound can do that. I mean, they could give me consent to get on the bus by buying a ticket. I have consent to get on the bus and wander around and look at the seats and just be generally obnoxious and as long as I don't commit a crime or something, they're not going to do anything to me. So I don't understand why Mr. Wise can challenge Greyhound, who owns the bus and employs the bus driver's policy. Well, he's not challenging Greyhound. He's just essentially saying that his, what would happen to him, his, and we make this argument that he was seized and that he was unreasonably searched, that occurs because of the unconstitutional boarding of the bus pursuant to the involuntary consent of the driver, but for that involuntary consent. But what if instead of the driver, they had called up Greyhound and said, we have your bus here, it's parked at a rest stop, may we search it? And the president of Greyhound said yes, and the bus driver said nothing. Would that be an involuntary search? I think that that, those are facts that the court could consider to determine whether or not the driver has been coerced, and I'm certain that the district court would consider exactly that. That's not what happened, but based upon the facts that the court had, the court determined that the driver was coerced. We have a, you're talking about a constitutional right of the driver that, assuming you're right, was violated, so the bus driver was coerced, therefore it's his constitutional right. How does that differ over to your client's constitutional right? Because he was a passenger on the bus, and it wasn't his right to say whether the bus could be searched or not, and so how do you adopt someone else's constitutional rights to apply to you? Well, the government has already mentioned the Wilmington case out of Pennsylvania, and that is a case where both the district court and the appellate court, not this circuit, this circuit hasn't directly addressed this issue, but the district court and the appellate court in that circuit looked at that and determined that the driver's consent was relevant, and that the passenger did have standing to assert that the driver's consent was coerced. So this has been, I would say to the Court that this has been an issue that's been addressed before by another circuit, and that's the Wilmington case. And the Wilmington was, what are the facts in that case? The Wilmington case involved a single bus. It wasn't a checkpoint case. It involved a single bus that had stopped at a tollbooth, and a police officer there at the tollbooth asked the driver if he would pull over. And the passenger defendant made one of his arguments that the court fully briefed and determined whether or not the driver had provided consent. Now, ultimately, the court determined that the driver had provided consent, but my point is that the defendant passenger was asserting the driver's consent as a defense that the appellate court and the district court accepted in determining whether or not the constitutional rights of the defendant had been violated. But does that really matter here? When your client consented, he voluntarily emptied his pockets, he let them look at the bag with the cocaine in it. And Your Honor asked that question about whether or not he voluntarily emptied his pockets, and government's counsel indicated that he did. He did not, with respect to the keys. That was a finding by the district court, and actually page 190 of the record on appeal talks about how he was requested to empty his pockets. He did. One of the officers then said, he, talking about another officer, told you to empty your pockets, went and grabbed the keys out of his pocket. That was not consent. And that's page 190 of the record on appeal. The district court determined that he was requested to empty his pockets, he consented, and then the officers obtained the keys from his pocket. So that's incorrect, and that is a very important point with respect to both the consent of the passenger, which is one of the basis that we are arguing on appeal, and also our argument with respect to Terry. But even if that's true, which I doubt, he did allow them to use the keys to open up the bag that he had abandoned. He didn't say, that's my private suitcase. You can't search it. Your Honor, I don't recall anything in the record where once they obtained the keys, if there was any request at all as to what they could or could not do with it, that hasn't been argued as far as I know by the government. The government's only said that he complied with emptying his pockets and with him taking the abandoned bag off of the bus. He didn't say, oh, wait, stop, that's my grandmother's quilt in that bag, I want to keep it. You're exactly right. He did not say that, Your Honor. But the point is, they then took that key, which our position is he did not consent to. There is basis in the record for that. The district court, with respect to them coming back for a second time, did not find that he complied with that. They then took that, and that, by the way, qualifies as a Terry stop. They didn't arrest him at that point. There was no concern at that point. There was no determination based on probable cause that he could be arrested. They took that, and then they went, as Your Honor points out, to the backpack, used it, opened it, saw that it opened the key, and then they arrested him. So that takes care of the two defenses that the government raises with respect to Terry. One, that it was consent with respect to the keys. No, it wasn't. And the second point is that it was incident to arrest. No, it wasn't. They took that key. They went and opened the backpack. And only then did they arrest him. Those are the two points the government raises with respect to a Terry stop. This was a violation of Terry, Your Honor. I just want to say on Wilmington, I'm looking at the Third Circuit opinion, and it says, Wilmington challenges the voluntariness of the driver's consent. Assuming arguendo that Wilmington has standing to contest that consent, and then they went on. So this isn't a case that holds that the passenger has standing. It says, well, you lose anyway, even if you have the standing. So I don't think it stands for the proposition you asserted. And Your Honor is looking at the appellate decision. That's what you're holding out to us as precedent. And I'm just saying it's not precedent for the point that you're making. I would say that that is a case of an appellate court that goes through and determines whether or not consent existed. Because they did. They went and determined that consent did exist in response to a defendant passenger. If it's an arguendo that the passenger had standing to contest the driver's consent, then it will go off on this consent. That doesn't show that a passenger has standing. It's not a holding to that effect that we would be creating a circuit split with respect to were we to rule the other way. That's the point I'm making. Maybe that's not relevant to you, but it's very important to me. Yeah. I understand the point you're making with respect to the consent of the driver. Again, I would say that the district court goes through and finds, we can speculate as to what the appellate court would have done if they would have determined consent did not exist. Since they determined it did, again, speculation, but perhaps that allows them to say, assuming arguendo, because it doesn't really matter. And that was their point. It doesn't matter. There was consent. My point in this case, there was not consent. But candidly, Your Honors, this was the primary points with respect to this appeal and the affirmation of the suppression order is that this was a checkpoint. This follows point by point, almost exactly. In fact, they probably looked at it with respect to the Edmonds case, going through exactly what happened with respect to Edmonds. It was at a fixed location. It was drug interdiction. You can't have that as a programmatic purpose. It was a plan for weeks in advance. Every single one of these that I'm saying right now is this case and Edmonds. It was chosen on two things. It was chosen based upon traffic flow. That's why they chose the bus station, is because all buses had to go there. That's why they chose the location in Edmonds, because it was the most traffic flow. It was chosen on traffic flow and crime statistics. There's testimony that narcotics dealers use the bus system. That's why they chose the bus. The two factors that Edmonds used, that's what the Conroe police used here. They are certainly trying to say there's a constitutional loophole. There's not. I'm out of time. Thank you, Your Honor. Thank you. Maura, you have five minutes for rebuttal. Just briefly, the Fourth Amendment comes into play only where there's a seizure. A seizure under Terry occurs when an officer has restrained the liberty of a citizen. Again, it was Greyhound here who decided when and where the bus is going to stop. And it was a Greyhound employee, the driver, who allowed the officers onto the bus. And I think that you can see all of this play out most clearly in Drayton, which is two years after Edmond. In Drayton, again, it was a scheduled bus stop. Three officers approached the driver. The driver consented to them boarding the bus. They had visible badges. They had plain clothes. They ID'd themselves as police. They asked requests. They requested the driver to board the bus. And then they spoke with all of the passengers. The Supreme Court said this was a consensual encounter. The Fourth Amendment wasn't implicated. And they affirmed the denial of the motion to suppress there. And I request that the Court do so here as well. What about Mr. Kinchin's position that his client didn't consent to giving up the keys? There's no indication on the record that he didn't consent to that. Indeed, the district court's finding was they asked him to empty his pockets. And he emptied his pockets. And there was a lanyard with a key. And the officer took the lanyard with the key and then used it to open up the backpack, the abandoned backpack. The opposing counsel indicated that the police took, physically removed the key from his pocket. Is that not correct? I don't believe that is the case. There is some contradictory testimony from the two officers as to how many times Mr. Kinchin put his hands back in and pulled things out. There were a number of things in there, change, ID, the keys. But there's no indication that his pulling everything out of the pocket was forced or coerced. It seems to be- So he was putting his own hands in his pocket. The policeman wasn't putting- Correct. His hand in the pocket. Correct. There was a request by the police officer that he pull everything out of his keys. It's true that the officer took the keys from him and used it to open up the backpack. Thank you. Thank you. Thank you.